*NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| LUCIANA BAKER, | : | Civil Action No. 08-cv-6382 (FLW) |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | OPINION |
| THE HARTFORD LIFE INSURANCE | : | |
| COMPANY and BLOOMBERG, LP - NEW | : | |
| YORK, ADMINISTRATOR OF THE | : | |
| BLOOMBERG LP LONG-TERM DISABILITY | : | |
| PLAN | : | |
| | : | |
| Defendants. | : | |
| | : | |

**<u>WOLFSON, United States District Judge</u>:**

This is the Court's determination of two separate Motions for Summary Judgment filed by both Plaintiff Luciana Baker ("Baker" or "Plaintiff") and Defendant Hartford Life and Accident Insurance Company ("Hartford" or "Defendant"), incorrectly plead as "The Hartford Life Insurance Company."  Plaintiff alleges that Defendant wrongfully denied her benefits pursuant to the Group Long Term Disability Insurance Plan ("the Plan") for Bloomberg, LP-New York's ("Bloomberg's") employees in violation of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001(a)(1)(b), et seq. ("ERISA").  In addition, Defendant moves to strike one of Plaintiff's summary judgment exhibits.  For the reasons that follow, the Court denies Plaintiff's Motion for Summary Judgment, grants Defendant's Motion for Summary Judgment, thereby affirming Defendant's denial of benefits, and denies Defendant's motion to strike.

1

## I.   Factual Background

### A.   The Plan

Under the Plan, Bloomberg employees are entitled to the receipt of long term disability ("LTD") payments where:

> [D]uring the Elimination Period and the following 24 months, Injury or Sickness causes physical or mental impairment to such a degree of severity that [the claimant is]:
>
> 1) continuously unable to perform the Material and Substantial Duties of [her] Regular Occupation; and
>
> 2) not Gainfully Employed.

Administrative Record ("AR") at HLI00007.  Material and Substantial Duties are those "necessary functions of [the claimant's] *Regular Occupation* which cannot be reasonably omitted or altered."  Id.  at HLI00018 (emphasis in original).  Importantly, the Plan defines Regular Occupation as "the occupation that [the claimant is] performing for income or wages on [the claimant's] *Date of Disability*.  It is not limited to the specific position [the claimant] held with [her] Employer."  Id. (emphasis in original).

The Plan places the burden of proving one's disability on the claimant.  AR HLI00014.  Specifically, it requires the submission of objective medical findings to support the claim.  Id.  "Objective medical findings include but are not limited to tests, procedures, or clinical examinations standardly accepted in the practice of medicine, for [the claimant's] disabling condition."  Id.

Hartford is designated, by the Plan, as administrator. This means, according to the Plan, that Hartford has "the authority to determine . . . eligibility . . . and entitlement to benefits under the policy."  Id.  at HLI00020.   The Plan grants Hartford "sole

discretionary authority . . . to determine . . . eligibility . . . and to interpret terms and provisions of the plan and any policy issued in connection with it." Id. The Plan, further, acknowledges that it is "governed by the laws of the governing jurisdiction and . . . ERISA ...." Id. In that regard, the Plan notes that a claimant whose claim is "denied or ignored . . . may file suit in a state or Federal court" pursuant to ERISA. Id. at HLI00025.

      B.     Baker's Disability Application and Appeals

Plaintiff Luciana Baker is a forty-six year old female who worked for Bloomberg News from January 24, 2000 to February 12, 2007.[1] AR at HLI00038-39. Her primary position was a news producer/editor.[2] In April of 2001, Plaintiff underwent microdiscectomy surgery on her lower back. Subsequently, in January 2007, Plaintiff began to complain of lower back pain. AR at HLI00291. On February 5, 2007, she took leave from Bloomberg per the Family Medical Leave Act. Id. at HLI00243. On February

---

[1] The Court notes that Plaintiff failed to provide record citations in her Statement of Facts both in her brief and in her response to Defendant's Statement of Material Facts, as is required by Local Rule 56.1. That rule requires

> The opponent of summary judgment shall furnish, with its opposition papers, a responsive statement of material facts, addressing each paragraph of the movant's statement, indicating agreement or disagreement and, *if not agreed, stating each material fact in dispute and citing to the affidavits and other documents submitted in connection with the motion;* any material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion.

L. Civ. R. 56.1(a) (emphasis added). Where record support was apparent, the Court provides them here. Where no record support was found, those facts have been omitted. It is not the Court's responsibility to comb the record on behalf of Plaintiff's counsel.

[2] Defendant categorized Plaintiff's position as a journalist/reporter. The distinction is not material to this case. It is safe to say that Plaintiff was involved in the production of news content.

3

7, 2007, Plaintiff underwent an MRI, which showed disc bulging and an annular tear in her lumbar spine, as well as some nerve root compression.  Id. at HLI00274.

       1.     STD Benefits Application

On the recommendation of her treating physician, Dr. Paul M. Cooke, M.D., a physiatrist,[3] Plaintiff ceased working and applied for short-term disability ("STD") benefits.  AR at HLI00293.  Her application for STD was submitted in February 2007, with the request that her benefits be payable beginning February 5, 2007.  Id. at HLI00238.  At that time, Plaintiff identified her disability as "due to spinal-related disease." Id  at HLI00248.

In support of her application, Plaintiff submitted the treatment records of Dr. Cooke. According to those records, Dr. Cooke diagnosed Plaintiff with chronic lower back pain and disc disease with acute exacerbation, partly due to complications from her April 2001 surgery.  AR at HLI00309.  Initially, Dr. Cooke opined that Plaintiff would be able to return to work full-time by May 1, 2007, AR at HLI00294, but in April of 2007, he extended that period until July 2007 to permit Plaintiff to fully take advantage of her strengthening and stabilization exercise program.  AR at HLI00275.

---

    [3]     A physiatrist is "a physical medicine and rehabilitation specialist."  Emery v. Astrue, 2009 WL 3030742, 4 n.1 (W.D.Pa. Sept. 17, 2009).  As explained in Emery,

> Many physiatrists specialize in pain management.  According to the website of the American Academy of Physical Medicine and Rehabilitation, physiatrists commonly treat chronic pain syndromes such as low back pain, chronic pelvic pain and fibromyalgia, with a goal of restoring a patient's daily functional abilities. See http://www.aapmr.org/condtreat.htm, last visited September 3, 2009.

Id. (internal citations omitted).

Because of these exercise programs (which consisted of an exercise class five days a week, daily home exercise program, and yoga exercises), as well as on-going acupuncture treatment, Dr. Cooke opined, Plaintiff's conditions vastly improved. Id. at HLI00271. Indeed, he stated, they improved so much that she no longer required any regular pain medication. Id. According to Dr. Cooke, Plaintiff also attributed the improvements to the fact that she has avoided prolonged sitting. Id. Dr. Cooke, further, opined that it was not advisable for Plaintiff to return to her previous position, if the amount of prolonged sitting required by her job could not be minimized. Id. at HLI00271-72. Plaintiff's application for STD benefits was approved forthwith.[4] Id. at HLI00238.

2.    LTD Benefits Application

Once Plaintiff's application for STD benefits was approved, Dr. Cooke advised Plaintiff that if she could not procure employment that did not require prolonged sitting, she should consider applying for long-term disability ("LTD") benefits. AR at HLI00272. Subsequently, on July 9, 2007, Plaintiff sent an email to Hartford stating that she would not be able to return to work in any capacity, and would require LTD. Id. at HLI00284. Soon thereafter, in August 2007, Plaintiff applied for LTD benefits. Id.

In connection with its claim review, Hartford mailed out several questionnaires. One of the questionnaires, which included a Physical Demands Analysis form regarding

---

[4]    The exact date that Plaintiff's STD benefits application was approved is not clear from the administrative record.

5

Plaintiff's job, was sent to Bloomberg.[5]   It received that questionnaire back from Bloomberg on August 3, 2007.  Id. at HLI00268.

On the Physical Demands Analysis form, Bloomberg stated the following about the nature of Plaintiff's position, that:

> (a) the work shift is 9 hours, 5 days a week;
>
> (b) she is required to use a computer, telephone, and headset;
>
> (c) a typical work day entails seven (7) hours of sitting, a half-an-hour of standing (.5) total, and a half-an-hour of walking (.5); and
>
> (d) that she may "[a]lternate sitting and standing as needed."

Id. The form, further, indicates that "[t]he work station can be modified regarding sitting v. standing ratio." Id.

Hartford also mailed out a form, termed the Long Term Disability Income Benefits Questionnaire, to Plaintiff.  Id. at HLI00264.  On August 29, 2007, Plaintiff completed and returned that form to Defendant.  On that form, she stated that, in addition to Dr. Cooke, she had been treated by Dr. Keyan Ma and Dr. Wang Chung Hsueh.  Id. at HLI00215.  Both of these doctors were described as acupuncturists.  Id.  She explained that she saw "Dr. Wang," presumably referring to Dr. Hsueh, whose address was located in Brazil, "from 2002 - until now."  Id. at HLI000206.  She, further, indicated that she had seen Dr. Ma, whose office is located in New Jersey, from "2006-2007."  Id.  However, Plaintiff submitted no evidence of her treatments with Dr. Ma and Dr. Hsueh.

---

[5]       It is not clear from the record whether this form was provided to Bloomberg in connection with Plaintiff's STD or LTD application.  In either event, and as explained in more detail *infra*, Hartford relied on the Bloomberg form in rejecting her LTD benefits application and appeal.

Additionally, Dr. Cooke submitted an Attending Physician's Statement at Plaintiff's request. In that statement, Dr. Cooke opined that Plaintiff was able to sit for a maximum of one-half hour at a time, four hours total per day. Id. at HLI00220. He further opined that she could stand for one hour at a time, four hours total per day. Id. He described the expected duration of her limitations as "indefinite." Id. In that regard, Dr. Cooke opined that Plaintiff was capable of participating in vocational rehabilitation services (including worksite accommodations, identifying alternative work, and/or retraining assistance). Id.

On September 14, 2007, Defendant sent a letter to Plaintiff, informing her that her application for LTD benefits was denied. Id. at HLI00190. Defendant explained that because the only functional limitation that appears to prevent Plaintiff from performing her duties is the inability to engage in prolonged sitting, and that Bloomberg has stated that the ratio between sitting and standing can be adjusted, Plaintiff's impairments would not preclude her from performing the essential duties of her occupation. Id. at HLI00192-93. Thereafter, Plaintiff obtained counsel and filed an administrative appeal on January 16, 2008. Id. at HLI00156.

### 3. LTD Benefits Appeal

On appeal, with new counsel, Plaintiff submitted six additional reports from six new doctors (as well as the Attending Physician's Statement from Dr. Cooke already given to Defendant). AR at HLI00156-57. Two of the reports, related to Plaintiff's on-going back problem, were from Dr. Keyan Ma and Dr. Wang Chung Hsueh—the two doctors whom Plaintiff referred to as "acupuncturists." Id. Noticeably, the office visits recounted in these reports occurred prior to Plaintiff's initial STD benefits application. The record

7

does not reveal why these reports were not provided to Hartford prior to the appeal.  The remaining four reports presented medical problems previously unreported by Plaintiff. These reports were from Dr. Gary A. Fantini, Dr. Steve J. Busono, Dr. Nataliya Dashevsky, and Dr. Marc I. Schwarzman.  Id.

Based on these records, "in conjunction with the reports previously reviewed by The Hartford," Plaintiff contended that her medical records "conclusively establish[ed]" that she suffered from back-related injuries, varicose vein disease, phlebectomy, and bladder-related diseases." Id. at HLI00157.  It was her contention that these diseases all arose from complications related to her 2001 back surgery.  She, further, asserted that Bloomberg "made certain modifications in her work station in an effort to accommodate her multiple disabilities." Id.  These modifications were made at her New York work station, she asserted.  Id.  However, she continued, she was "denied the opportunity to sit or stand as required during her work day by her supervisor." Id.  She did not explicitly indicate the time frame during which these modifications were made; yet, the context reveals that these attempts at modifications were made sometime before her departure in February 2007.

a.    Dr. Ma

Dr. Ma's report, dated September 25, 2007, detailed what appeared to be a superficial examination.  AR at HLI00171.  A series of tests were performed, each given non-descriptive names, all of which seemed to confirm the existence of back pain and nothing more.  AR at HLI00171-72.  Dr. Ma also reviewed the MRI and EMG results taken back in February, and offered no additional diagnosis.  AR at HLI00172.  Without additional explanation, Dr. Ma concluded that Plaintiff "is a journalist who has to stay

sedentarily [sic] during the work.  She is unable to perform the work duty under her medical conditions.  She is strongly recommended for long term disability." Id.  Attached to the report is a list of "Treatment Schedule," which amounts to nothing more than an attendance log of all of the visits by Plaintiff to Dr. Ma, of which there are dozens.  AR at HLI00173-75.  No treatment notes of any kind were provided about any of these visits. Dr. Ma also did not opine as to whether Plaintiff could work if her position was modified to avoid prolonged sitting.  Def.  Stat.  of Mat.  Facts at ¶ 47; Pl.  Resp. to Def.  Stat.  Mat. Facts at ¶ 47.

> b.      Dr. Hsueh ("Dr. Wang")

Dr. Hsueh, who is based out of Rio de Janeiro, Brazil, submitted a report dated October 21, 2007.  AR at HLI00183.  Dr. Hsueh plainly stated, "[s]he suffers from chronic low back pain, vascular insufficiency of the arteries in both legs, and neurogenic bladder as a result of complications of a spinal surgery she was submitted to in April 2001."  Id. Dr. Hsueh did not give any explanation for his diagnosis.  Then he opined, "[d]ue to Ms. Baker's spinal-related diseases she is unable to perform any type of sedentary work as the sitting and standing for prolonged periods of time exacerbate her medical problems.  I recommend Ms. Baker to go on long-term disability."  Id.  In short, neither the report of Dr. Ma or Dr. Hsueh contained objective medical evidence of Plaintiff's conditions.

> c.      Dr. Frantini

Dr. Fantini's report include notes of two visits by Plaintiff, where Plaintiff complained of bilateral foot discoloration.  AR at HLI00167-68.  On the initial visit, dated February 21, 2006, Dr. Fantini examined Plaintiff and found no significant abnormalities: blood pressure was normal; aortic pulsation was normal; femoral and distal arterial

pulses were intact and full bilaterally; skin quality was excellent; and capillary refill was normal. AR at HLI00168. Dr. Fantini did find that "[f]eet were cool, with a slight blueish hue, evident only with dependency." Id. Dr. Fantini opined that the discoloration was "likely a manifestation of venous stasis, as she does have varicose vein disease." AR at HLI00168. It is unclear how Dr. Fantini knew about the varicose vein disease, as no evidence of diagnosis was submitted by Plaintiff. Dr. Fantini had no specific recommendation at that time. AR at HLI00169.

According to Dr. Fantini's report, Plaintiff again visited him on September 21, 2007. Id. at HLI00167. Unlike her first visit, this one was after her application for LTD. See id. Plaintiff informed Dr. Fantini that she had been out on STD for five months, and was in the process of seeking LTD. Id. Dr. Fantini again examined Plaintiff and found no significant abnormalities; he did find a very small cluster of venous varicosities over the mid leg on the right. Id. Dr. Fantini diagnosed Plaintiff with spondylosis lumbar sacral spine, consistent with her spinal and back history, and opined that the bilateral foot discoloration was mild. Id. Again, no recommendation was given. Id.; Pl. Resp. to Def. Stat. Mat. Facts at ¶ 39.

### d. Dr. Busono

Dr. Busono's report described a consultative visit on September 28, 2007, Plaintiff having apparently been referred to his office by Dr. Dashevsky. During Plaintiff's visit with Dr. Busono, Plaintiff complained of an urinary problem. AR at HLI00177. Dr. Busono's examination revealed no abnormalities, but based on Plaintiff's history and description of blood in the urine, diagnosed Plaintiff with possible neurogenic bladder and cauda equina syndrome, and opined that "[s]he needs to go to the hospital but she

insisted on going to see her primary physician first." Id.  No other recommendation was given. Def. Stat. of Mat. Facts at ¶ 51; Pl. Resp. to Def. Stat. Mat. Facts at ¶ 51.  There is also no additional report of any hospital visits.

> e.     Dr. Dashevsky

Dr. Dashevsky's report is a short letter written on October 9, 2007, addressed to "To Whom It May Concern," where Dr. Dashevsky stated that Plaintiff has neurogenic bladder and vascular insufficiency of the arteries, also neurogenic in nature.  AR at HLI00179. Dr. Dashevsky opined that Plaintiff's symptoms are exacerbated by sitting for long periods of time. Id. Based on representations from Plaintiff, Dr. Dashevsky further concluded that Plaintiff's job "could [not] be modified to meet her needs."  Def. Stat. Mat. Facts at ¶ 70; Pl. Resp. to Def. Stat. Mat. Facts at ¶ 70.  Dr. Dashevsky attached no treatment notes, no examination results, and offered no basis for her diagnosis.  Def. Stat. Mat. Facts at ¶ 53; see Pl. Resp. to Def. Stat. Mat. Facts at ¶ 53 ("Hartford never requested [any such records] ....").

> f.     Dr. Schwarzman

Dr. Schwarzman's report summarized another consultative visit on October 16, 2007, again on an apparent referral by Dr. Dashevsky, where Plaintiff was examined for her urinary problems.  AR at HLI00181.  Upon examination, Dr. Schwarzman found that her urine culture was negative, and Plaintiff had normal urine flow. Id. Plaintiff's urethra had a normal caliber and mucosa. Id. Her bladder neck was not stenotic, and had a normal capacity and shape "with no tumor, erythema, calculus, or trabeculation." Id. Her ureteral orifices were normally positioned and shaped. Id. Based on these examination results, Dr. Schwarzman opined that the cause of her urinary problem was unclear. Id.

He stated that the problem may have been due to her underlying spinal problem, but the onset seems unrelated to her spinal surgery.  Id.  At Plaintiff's request, he instructed her on the techniques of urethral self-catheterization.  Id.  Dr. Schwarzman did not opine as to whether any urinary problems affected Plaintiff's ability to work. Def. Stat. Mat. Facts at ¶ 61; Pl. Resp. to Def. Stat. Mat. Facts at ¶ 61.

> g.      Hartford's Consultant - Dr. Nemunaitis, Jr.

As part of the appeals process, Defendant obtained an independent medical consultant, Dr. John G. Nemunaitis Jr., to conduct a review of the available medical evidence.  AR at HLI00145-147.  As part of his review, in addition to examining the medical evidence submitted, Dr. Nemunaitis also attempted to contact Dr. Ma, Dr. Dashevsky, and Dr. Cooke for further information. AR at HLI00145.  Dr. Ma refused to discuss the case with Dr. Nemunaitis because he stated that he did not have Plaintiff's approval to do so.  Id.  However, Dr. Nemunaitis was able to speak with Dr. Dashevsky and Dr. Cooke.  Id.  Dr. Cooke repeated his previous diagnosis regarding Plaintiff's capacity to operate at a sedentary work level, with a restriction of 30 minute limit sitting time.  AR at HLI00146.  However, Dr. Cooke felt that Plaintiff would be able to return to work if allowed to get up and walk around frequently, and that perhaps her job could be modified to meet her needs.  Id.  Dr. Nemunaitis also described his conversation with Dr. Dashevsky as follows:

> The neurologist, Dr. Dashavesky (sic), stated that the claimant is functioning at a sedentary work capacity, but limited her sitting time to 20 minutes.  The neurologist did not feel that the claimant could return to work because of the sitting timeframe limitation for it would be impossible to modify her work functioning relative to the sitting restrictions.  The claimant is a journalist at a sedentary work

> capacity.   The neurologist indicated that her sitting
> restrictions will never improve and that she is permanently
> and totally 'disabled' for any work functioning.  He pointed
> out she has severe pain when sitting at home for more than
> 20 minutes. The neurologist did not feel that the job could be
> modified to meet her needs.

Id.

Plaintiff submitted, along with her Motion for Summary Judgment, a sworn declaration from Dr. Dashevsky, describing what she contends is missing from the conversation between Dr. Nemunaitis and Dr. Dashevsky.  Plaintiff's Memorandum of Law In Support of Motion For Summary Judgment, Exhibit 15.[6]  Dr. Dashevsky stated that she described to Dr. Nemunaitis a detailed description of Plaintiff's conditions and what she believes is the cause of these conditions.  Id. at 1-2.  She also explained to Dr. Nemunaitis that Plaintiff's conditions not only cause severe pain, but if aggravated can

---

[6]   Defendant filed a Motion to Strike with regard to Dr. Dashevsky's sworn statement.   Defendant argues that it amounts to an attempt to supplement the administrative record after the fact.  A plan administrator's decision is reviewed "based upon the facts as known to the administrator at the time the decision was made." Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc. Employee Health and Welfare Plan, 298 F.3d 191, 199-200 (3d Cir. 2002) (citation omitted).  As such, "the record for arbitrary and capricious review of ERISA benefits denial is the evidence that was before the plan administrator at the time of the benefit denial, which cannot be supplemented during litigation." Marciniak v. Prudential Financial Ins. Co. of Am., 184 Fed.Appx. 266, 269 (3d Cir. 2006) (citation omitted).

In my view, Defendant mischaracterizes the purpose of Dr. Dashevsky's sworn statement.  Plaintiff is attempting to shed light on the conversation between Dr. Nemunaitis and Dr. Dashevsky, which formed part of the basis for Dr. Nemunaitis's report.  Anything that was said to Dr. Nemunaitis during that conversation would be considered a part of the administrative record, and Plaintiff is entitled to submit evidence of what was or was not said in that conversation. Cf. Gardner v. Unum Life Ins. Co., 2009 WL 4457515, *5 n.4 (3d Cir. Dec. 4, 2009) ("[C]harges of fraud or mistake in the [administrative] record are subject to scrutiny.").  Therefore, Plaintiff's submission of Dr. Dashevsky's sworn statement does not amount to an attempt to supplement the administrative record during litigation, and Defendant's Motion to Strike is hereby denied.

leave Plaintiff vulnerable to bilateral leg amputation and urinary sepsis.  Id. at 2.  She purportedly further stated to Dr. Nemunaitis that Plaintiff's conditions can be aggravated by sitting for as little as one to two hours at a time.  Id.  Finally, Dr. Dashevsky advised Dr. Nemunaitis that Plaintiff should not sit for more than fifteen minutes at a time.  Id.

After reviewing available evidence submitted by Plaintiff, and taking into account the conversations he had with Plaintiff's doctors, Dr. Nemunaitis concluded that "[t]he examination findings did not objectively validate that the claimant could sit maximally for 30 minutes," and that "[t]he physician recommended restrictions/limitations are primarily based on self reported findings."  AR at HLI00147.

h.    Hartford's Denial of the Appeal

Based upon Dr. Nemunaitis's report, combined with its previous findings during initial denial, Defendant affirmed its initial denial and denied Plaintiff's appeal.  AR at HLI00141-42.  Hartford concurred with Dr. Nemunaitis's conclusion that the urinary and venous related medical opinions were based primarily on self-report findings.  Id.  at HLI00142.  Hartford, further, noted that Dr. Nemunaitis was not able to connect with Dr. Ma for additional information.  Id.  This denial letter did not specifically reference the Bloomberg Physical Demand questionnaire, but focused on the supplemental evidence supplied by Plaintiff in connection with her appeal.  See id.  at HLI00141-142.

C.    Instant Action

Following Hartford's denial, Plaintiff filed the instant action pursuant to ERISA. Plaintiff and Defendant each moved for summary judgment, seeking reversal and affirmance, respectively, of Hartford's decision.  For the following reasons, the Court will deny Plaintiff's motion and grant Defendant's motion.

14

## II.    Standard of Review

### A.    Summary Judgment Standard

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n. 1 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); accord Fed. R. Civ. P. 56(c).  For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party." Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Curley v. Klem, 298 F.3d 271, 276-77 (3d Cir. 2002).  For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law." Kaucher, 455 F.3d at 423.  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp., 477 U.S. at 323.  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial.  Id.; Monroe v. Beard, 536 F.3d 198, 206-07 (3d Cir. 2008).  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  Anderson, 477 U.S. at 256-57.  The

nonmoving party "must do more than simply show that there is some metaphysical doubt as to material facts." Id. at 206 (quoting Matsushita, 475 U.S. at 586). Moreover, the non-moving party must present "more than a scintilla of evidence showing that there is a genuine issue for trial." Woloszyn v. County of Lawrence, 396 F.3d 314, 319 (3d Cir. 2005). Indeed, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex Corp., 477 U.S. at 322.

Moreover, in deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. Nonmoving party cannot defeat summary judgment simply by asserting that certain evidence submitted by the moving party is not credible. S.E.C. v. Antar, 44 Fed.Appx. 548, 554 (3d Cir. 2002).

B.    Applicable Standard of Review Under ERISA

In evaluating Plaintiff's claim, the Court's first task is to determine the applicable standard of review under ERISA. The Supreme Court, in Firestone Tire and Rubber Co. v. Bruch, held that a denial of benefits under ERISA is to be reviewed "under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." 489 U.S. 101, 115 (1989). Thus, where the plan affords the administrator discretionary authority, the administrator's interpretation of the plan "will not be disturbed if

reasonable." Mitchell v. Eastman Kodak Co., 113 F.3d 433, 437 (3d. Cir. 1997) (quoting Firestone, 489 U.S. at 111. In other words, when a plan administrator has discretion to determine a claimant's eligibility for benefits, the plan administrator's decision is subject to review under an arbitrary and capricious standard. Doroshow v. Hartford Life and Acc. Ins. Co., 574 F.3d 230, 233 (3d Cir. 2009).

However, "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion." Firestone, 489 U.S. at 115 (internal quotation marks and citation omitted). A conflict of interest can be created, for example, when an employer both funds and evaluates employee claims. Metropolitan Life Ins. Co. v. Glenn, 128 S.Ct. 2343, 2348 (2008). A conflict of interest can also be created if an employer pay an independent insurance company to both evaluate claims and pay plan benefits. Id.; Pinto v. Reliance Standard Life Ins. Co., 214 F.3d 377, 383 (3d Cir. 2000) abrogated in part by Glenn, supra at 2350. However, a conflict of interest is not present if an employer funds a benefits plan, but an independent third party is paid to administer the plan. Pinto, 214 F.3d at 383. Additionally, if an employer establishes a plan and creates an internal benefits committee vested with the discretion to interpret the plan and administer benefits, a conflict of interest is not found. Id.; see also Post v. Hartford Ins. Co., 501 F.3d 154, 164 n. 6 (3d Cir. 2007).

Recently, the Supreme Court in Glenn altered the way in which a conflict of interest is handled by the courts. Glenn, 128 S.Ct. at 2350. Previously, a finding of a conflict of interest resulted in the heightening of the arbitrary and capricious standard along a sliding scale, taking into account several factors including: the "sophistication of the

parties, the information accessible to the parties, the exact financial arrangement between the insurer and the company; and the status of the fiduciary, as the company's financial or structural deterioration might negatively impact the presumed desire to maintain employee satisfaction." Stratton v. E.I. Dupont de Nemours & Co., 363 F.3d 250, 254 (3d Cir. 2004) (internal quotations omitted).

Glenn rejected heightening the arbitrary and capricious standard. The Supreme Court reasoned that Firestone held that the word "factor" implies that courts should review the propriety of benefit denials, by taking into account many factors, including a conflict of interest. Glenn, 128 S.Ct. at 2351. Effectively, the Court reaffirmed Firestone to the extent that deference should be given to "the lion's share of ERISA claims." Id. at 2350. The Court opined that the conflict of interest may be more important in circumstances "suggesting a higher likelihood that it affected the benefits decision," and would prove less important "when the administrator has taken active steps to reduce potential bias." Id. at 2351. Potential bias could be reduced "by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decision making irrespective of whom the inaccuracy benefits." Id. In any event, the governing standard requires the plaintiff to show that the denial of benefits was arbitrary and capricious, with a conflict of interest as simply one factor for the court's consideration. See Dolfi v. Disability Reinsurance Management Services, Inc., 584 F.Supp.2d 709, 730 (M.D. Pa. 2008) (citing Glenn, 128 S.Ct. at 2350).

Plaintiff argues that the standard of review in this case should be de novo. Plaintiff asserts that by operation of New Jersey law, N.J.A.C. § 11:4-58.3 (2007), Bloomberg's delegation of discretionary authority to Defendant is invalid. Section 11:4-58.3 states that

no insurance policy delivered or issued in New Jersey may contain a provision "purporting to reserve sole discretion to the carrier to interpret the terms of the policy or contract ...." Denial of benefits under ERISA is to be reviewed "under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone, 489 U.S. at 115. Thus, Plaintiff claims, because the Plan purports to "delegate[] sole discretionary authority" to Defendant, AR at HLI00020, in apparent violation of § 11:4-58.3, Defendant's denial must be reviewed de novo. However, § 11:4-58.3 also states, "[a] carrier may include a provision stating that the carrier has the discretion to make an initial interpretation . . . but that such interpretation can be reversed by an internal utilization review organization, a court of law, arbitrator or administrative agency having jurisdiction."  The purpose underlying the regulation is "to prohibit the use of discretionary clauses in all life, health and long-term care insurance policies and contracts [and] to avoid the conflict of interest that occurs when the carrier responsible for providing benefits has sole discretionary authority to decide what benefits are due." N.J.A.C. § 11:4-58.1(a).  The regulation was made effective January 1, 2008 and, as such, predates the Supreme Court's conflict-of-interest decision in Glenn.

There are several problems with Plaintiff's argument.  First, nothing in the text of § 11:4-58.3 states that it mandates application of a de novo standard of review.  Rather, according to the Third Circuit, the text simply declares that certain "discretionary clauses are void as contrary to public policy ...." Evans v. Employee Benefit Plan, Camp Dresser & McKee, Inc., 311 Fed.Appx. 556, 560 (3d Cir. 2009).  Plaintiff's argument appears to be that the statute implicitly authorizes a de novo standard of review, but she has pointed to

nothing in the text nor any case law to support such an interpretation.  Second, because

ERISA explicitly grants claimants the right to judicial review, delegations under ERISA

do not actually reserve sole discretion to the carrier in the manner Plaintiff suggests.

While the Plan here grants Hartford sole discretionary authority,[7] its statement of "YOUR

RIGHTS UNDER ERISA" acknowledges that the exercise of Hartford's discretion may be

challenged in a court of law.  AR at HLI00025 ("If You have a claim for benefits which is

denied or ignored, in whole or in part, You may file suit in a state or Federal court.").  The

inclusion of this language in the Plan is significant because N.J.A.C. § 11:4-58.3 permits

carriers to "include a provision stating that the carrier has the discretion to make an initial

interpretation . . . but that such interpretation can be reversed by . . . a court of law ...."

Thus, by incorporating the ERISA's rights language, the Plan comports with the statute.

Third, it is questionable whether the statute applies at all, given that its effective date

(January 1, 2008) was after Plaintiff filed her initial application for benefits on August 12,

2007.

        Most importantly, if I were to adopt Plaintiff's interpretation and application of §

11:4-58.3, so as to void the Plan's grant of sole discretion to Hartford, the regulation

would face an ERISA preemption attack.  "[A]ny state-law cause of action that duplicates,

supplements, or supplants the ERISA civil enforcement remedy conflicts with the clear

---

        [7]        For this reason, the Third Circuit's ruling in <u>Evans v. Employee Benefit Plan,
Camp Dresser & McKee, Inc.</u>, 311 Fed.Appx. 556 (3d Cir. 2009) is not dispositive.  In that
case, the Third Circuit found N.J. Admin. Code § 11:4-58.3 inapplicable to a Plan that did
not grant sole discretion to the plan administrator.  <u>Id.</u> at 560.  That plan provided that the
administrator "in its discretion has authority to interpret the terms, conditions, and
provisions of the entire contract."  <u>Id.</u> at 558.  The Plan here, by contrast, explicitly grants
"*sole* discretion" to Hartford.  AR at HLI00020 (emphasis added).

congressional intent to make the ERISA remedy exclusive and is therefore pre-empted."

Aetna Health Inc. v. Davila, 542 U.S. 200, 209 (2004) (citation omitted).  Plaintiff's

construction of section 11:4-58.3 would in effect change the standard of review of every

civil enforcement action under ERISA within the state of New Jersey whenever the plan

in question grants discretionary authority to the plan administrator.  This would directly

violate the purpose of ERISA "to provide a uniform regulatory regime over employee

benefit plans."  Id. at 208.  Moreover, the Supreme Court's recent decision in Glenn,

addressing the same conflict-of-interest concern underlying the New Jersey regulation,

expressly set forth the applicable standard of review under ERISA.  As district courts are

obliged to "dispose of cases on the narrowest possible ground, which in this case is the

state-law ground," as opposed to federal pre-emption grounds, see New Jersey Payphone

Ass'n, Inc. v. Town of West New York, 299 F.3d 235, 249 (3d Cir. 2002), I reject Plaintiff's

interpretation of the New Jersey regulation and review the case under the traditional

arbitrary and capricious standard.

Under the arbitrary and capricious standard, the claim determination will be

upheld if it is supported by substantial evidence.  Doroshow, 574 F.3d at 234 ("Under a

traditional arbitrary and capricious review, a court can overturn the decision of the plan

administrator only if it is without reason, unsupported by substantial evidence or

erroneous as a matter of law").  "The scope of this review is narrow, and the court is not

free to substitute its own judgment for that of the defendants in determining eligibility for

plan benefits."  Id. (internal quotation marks omitted).  Although the arbitrary and

capricious standard is extremely deferential, "[i]t is not … without some teeth."  Moskalski

v. Bayer Corp., 2008 WL 2096892, at *4 (W.D. Pa. May 16, 2008) (quoting McDonald v.

Western-Southern Life Ins. Co., 347 F.3d 161, 172 (6th Cir. 2003)).  "Deferential review is not no review, and deference need not be abject."  Id. (citation omitted).  Substantial evidence requires more than a "mere scintilla" of evidence."  Id. at *4 n. 3 (citation omitted).  Where the Plan so directs, the plaintiff bears the ultimate burden of proof and must present the required medical information to the Plan in order for the Plan (through the Claims Administrator) to find that she is disabled.  See Mitchell, 113 F.3d at 439-440.

## III.   Discussion

As noted, under the Plan in question, Plaintiff is entitled to receive LTD benefits if:

> [D]uring the Elimination Period and the following 24 months, Injury or Sickness causes physical or mental impairment to such a degree of severity that You are:
>
> 1) continuously unable to perform the Material and Substantial Duties of Your Regular Occupation; and
>
> 2) not Gainfully Employed.

AR at HLI00007.[8]  The Plan defines "Material and Substantial Duties" as "the necessary functions of Your Regular Occupation which cannot be reasonably omitted or altered."  AR at HLI00018.  "Regular Occupation" is defined as "the occupation that You are performing for income or wages on Your Date of Disability.  It is not limited to the specific position You held with Your Employer."  Id.  The parties do not dispute that Plaintiff is qualified to apply for LTD benefits under the Plan.  The dispute centers around whether Plaintiff can perform the necessary functions of her job, and whether Defendant's

---

[8]      The Plan also provides for LTD benefits after the initial 24 months period under a Social Security-like "unable to engage in any occupation" standard, AR at HLI00007, but that part of the Plan is not the subject of this dispute.

determination in that regard was arbitrary and capricious.

A.     Conflict of Interest

As an initial matter, the Court addresses the potential conflict of interest present in this case.  Plaintiff relies heavily on the purported existence of a conflict in her motion for summary judgment.  A conflict of interest is created when an employer pays an independent insurance company to both evaluate claims and pay plan benefits.  Glenn, 128 S.Ct. at 2348.  In this case, Bloomberg hired Hartford to both administer and pay plan benefits.

While this may constitute a structural conflict of interest, such a conflict is but one factor in determining if a denial of benefits is arbitrary and capricious.  Id. at 2351.  A conflict of interest may be more important if circumstances of a case suggest a higher likelihood that it affected the benefits decision.  Id.  The existence of conflict, alone, would not be determinative.  Id. at 2352.

Turning to the circumstances of this case, nothing suggests that Defendant's denial of benefits was somehow influenced by the existence of the structural conflict.  Beyond pointing out the existence of the conflict, Plaintiff offers no additional evidence on how that conflict may have affected Defendant's decision.  Instead, Plaintiff's argument seems to be reverse reasoning: Because Defendant's conduct was arbitrary and capricious, she argues, Defendant must be operating under a conflict of interest.

The Court is mindful that the existence of a conflict may potentially affect every aspect of an administrator's conduct, and thus the two cannot be so easily separated.  However, it is still Plaintiff's burden to present a causal connection between the financial incentives that created the conflict of interest and the conduct which Plaintiff believes was

influenced by that conflict.  In <u>Glenn</u>, this causal connection was established when the administrator encouraged the claimant to apply for Social Security Disability ("SSD") benefits in order to off-set its financial burdens, but after the claimant applied for and was granted SSD benefits, the administrator ignored the Social Security Administration's findings and denied claimant's application for LTD by finding that she was not disabled, thus benefitting financially at both ends.  <u>Id.</u>  Plaintiff has pointed to no such causal connection here.  Thus, the Court will consider the inherent structural conflict as one factor, but not a significant one, in ascertaining whether Hartford's decision was arbitrary and capricious.

      B.     Plaintiff's Post-STD Benefit Approval Conduct

Defendant makes much of Plaintiff's trips to Brazil to treat with Dr.  Hsueh, and that she engaged in several hours of exercise daily.  In Defendant's view, this conduct undercuts Plaintiff's disability claim.  This is not necessarily the case.  It is clear from the medical records that Plaintiff's daily exercise regimen was directed by her doctors.  And, that she traveled to and from Brazil alone may not have involved prolonged sitting for more than one day at a time.  Indeed, Plaintiff explains (albeit in her brief and not a certification) that she went to Brazil to visit family and treated with Dr.  Hsueh while there.  Whatever her reason, it is not clear from the record how she traveled—whether by airplane, jet, or some other form of transportation—the extent of her stay, nor the number of times she traveled back and forth.

That said, Hartford, as administrator, is free to view her trip(s) with a jaundiced eye.  I note here only that Hartford's skepticism based on her Brazilian treatment could not alone support denial of her claim.

24

C.     Plaintiff's Urinary and Venous Insufficiency Related Conditions

Plaintiff contends that Hartford did not adequately consider these conditions in its denial of her LTD benefit application.  As an initial matter, the Court notes that Plaintiff acknowledges in her response to Defendant's Statement of Material Facts that Drs. Schwarzman, Dashevsky, Busono, and Fantini did not opine on the effect of her urinary and venous insufficiency conditions on her ability to work.  See Section I.B.3, supra.  In addition, these doctors' reports provided little to no objective medical evidence in support of the existence of these conditions.  Plaintiff attempts to shift the burden to Defendant by noting that Hartford did not request copies of medical records, and that Dr. Nemunaitis did not follow-up with each doctor for additional information.  It is not Hartford's responsibility, however, to substantiate Plaintiff's disability claim.  The Plan places that burden squarely on her shoulders.  See AR at HLI00014 (requiring claimant to provide to Hartford "[o]bjective medical findings which support [the claimant's] [d]isability.").

D.     Dr. Nemunaitis's Report

Plaintiff next argue that Defendant's reliance upon Dr. Nemunaitis's report was improper, because Dr. Nemunaitis 1) was not a specialist in neurology or urology, 2) dismissed the opinions of multiple treating physicians, and 3) did not assess whether Plaintiff can perform the duties of her occupation. The Court will address each argument below.

1.     Dr. Nemunaitis's status as a non-specialist

With regard to the issue of Dr. Nemunaitis's lack of specialized knowledge, Plaintiff cites to no relevant case law that requires a reviewing medical consultant to possess

25

specialized knowledge within each and every field of medicine that he or she is tasked to review.  Instead, courts have held that when an administrator chooses to adopt the opinions of a non-specialist consultant over a treating specialist, the administrator or the consultant may be required to explain its choice, but it is not automatically arbitrary and capricious.  See e.g., Kaufmann v. Metro. Life Ins. Co., 658 F.Supp.2d 643, 649 (E.D. Pa. 2009);  Schlegel v. Life Ins. Co. of North Am., 269 F.Supp.2d 612, 627-28 (E.D.Pa.2003) cited with approval in Brandeburg v. Corning Inc. Pension Plan for Hourly Employees, 243 Fed.Appx. 671, 673 (3d Cir. 2007).

> 2.   Dr. Nemunaitis's rejection of the opinions of  multiple treating physicians

Contrary to Plaintiff's suggestion, ERISA does not require plan administrators to accord special deference to opinions of treating physicians, nor does it impose a heightened burden of explanation on administrators when they reject a treating physician's opinion.  Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003).  Moreover, Dr. Nemunaitis did explain why he rejected the opinions of some of the treating physicians.  First, Dr. Nemunaitis explained that Dr. Cooke and Dr. Dashevsky both agree that Plaintiff is capable of sedentary work.  AR at HLI00146.  Second, Dr. Nemunaitis cited to Dr. Cooke, Plaintiff's primary treating physician, who stated that Plaintiff would be able to work if allowed to get up and walk around frequently, and that her job could be modified to meet her needs.  Id.  Finally, Dr. Nemunaitis, after reviewing all of the medical reports, opined that he does not believe the objective medical evidence supports the assertion that Plaintiff cannot return to her previous employment, and any limitations are primarily based on self reported findings.  AR at HLI00146-47.  Based

upon the lack of objective medical evidence submitted by Plaintiff to support her alleged impairments, the Court can hardly say this was an unreasonable conclusion.

Defendant then combined Dr. Nemunaitis's report with its prior finding that Bloomberg can modify Plaintiff's sitting v. standing ratio to conclude that Plaintiff is able to perform the material and substantial duties of her occupation on a continuous basis. AR at HLI00141-42. (The Court will address, *infra*, the reasonableness of Hartford's reliance on Bloomberg's representation.) There is nothing arbitrary and capricious about Defendant's conduct: Defendant hired an independent consultant to review the medical files; the consultant reviewed the files in their entirety, including phone calls to all of Plaintiff's treating physicians, before offering his opinions, AR at HLI00145; Defendant then chose to adopt the consultant's opinions over those of other treating physicians, which is not in itself arbitrary and capricious.  See Stratton, 363 F.3d at 258 ("A professional disagreement does not amount to an arbitrary refusal to credit [a treating physician]"); see also Burk v. Broadspire Services, Inc., 342 Fed.Appx. 732, 737-738 (3d Cir. Aug. 18, 2009).

Plaintiff also argues that Dr. Nemunaitis failed to incorporate into his report crucial information given to him by Dr. Dashevsky during their phone conversation.  As evidence, Plaintiff submitted a sworn statement by Dr. Dashevsky as part of her Motion for Summary Judgment.  However, nothing described in Dr. Dashevsky's sworn statement appears to be inconsistent with Dr. Nemunaitis's account of the conversation within his report; Dr. Nemunaitis simply did not include in his report the consequences of Plaintiff's prolonged sitting, but provided a fairly accurate summary of Dr. Dashevsky's opinion regarding Plaintiff's functional capacity.  The severity of the consequences is not, and

should not be, a factor in determining Plaintiff's functional capacity. With regard to Dr. Dashevsky's claim that Plaintiff can only sit for fifteen minutes at a time, this is inconsistent with the findings of Plaintiff's other treating physician, Dr. Cooke. Therefore, the Court finds that Defendant's reliance on Dr. Nemunaitis's report was within reason and supported by substantial evidence. <u>Accord</u> <u>Burk</u>, 342 Fed.Appx. at 738 n.6.

        3.     Dr. Nemunaitis did not address Plaintiff's occupational capacity

Plaintiff states in her brief that "[p]erhaps most significantly, Dr. Nemunaitis did not offer an opinion that Ms. Baker could perform the material and substantial duties of regular occupation." Plaintiff's Memorandum of Law In Support of Motion For Summary Judgment, at 19. Again, however, Plaintiff cites no relevant case law that holds that it is the responsibility of the *independent medical consultant* to make that determination. While Defendant must ultimately make that determination, that burden does not fall on Dr. Nemunaitis. Defendant is required to make sufficiently detailed findings with regard to both Plaintiff's capacity and her occupation's requirements, and to make a rational comparison between the two possible, <u>Havens v. Continental Cas. Co.</u>, 186 Fed.Appx. 207, 212 (3d Cir. 2006). Having already found that Defendant made an adequate determination with regard to Plaintiff's only limitation, and that it can be accommodated by Plaintiff's employer, the fact that Dr. Nemunaitis did not address Plaintiff's occupational capacity is of no relevance. Accordingly, the Court finds that the absence of Dr. Nemunaitis's opinion on Plaintiff's ability to perform her occupation did not preclude Defendant from relying on his report.

        4.     Other Errors in Dr. Nemunaitis's Report

Lastly, Plaintiff highlights other errors in Dr. Nemunaitis's report. These errors

include referring to Dr. Hseuh as "Dr. Wang," and other similar reference to a doctor's first name. While these errors may be present they do not go to the substance of Dr. Nemunaitis's report, nor do they alone suggest that Hartford' reliance on his report was inappropriate.

E.      Bloomberg's Willingness to Accommodate

Based on my review of the record and the parties' arguments, it is clear that Plaintiff's only purported functional limitation that prevents her from performing her job is her inability to sit for prolonged periods. Plaintiff's own treating physician, Dr. Cooke, believes that Plaintiff should not sit for more than one-half hour at a time, or risk exacerbating her physical injuries. AR at HLI00161; AR at HLI00271-72. Other of Plaintiff's doctors may have suggested a shorter time frame; but the consensus is that Plaintiff should not sit for prolonged periods.

Plaintiff argues that because her work demands prolonged sitting, often more than thirty minutes at a time, she must therefore be deemed disabled. She, specifically, argues that the nature of her work as a reporter precludes her from taking sufficient breaks from sitting. See Pl. Resp. to Def. Stat. Mat. Facts at ¶ 42. She, further, contends that, prior to her leaving Bloomberg in February 2007 on short-term disability, Bloomberg unsuccessfully attempted to accommodate her. See id. at ¶ 43.

Defendant denied Plaintiff's claim because it found that Bloomberg can accommodate Plaintiff's sitting restriction by altering the ratio of sitting and standing required for her job. AR at HLI00192. Plaintiff argues that this is arbitrary and capricious because the only evidence supporting this finding is a single sentence in the Physical Demand Analysis report submitted by Bloomberg that stated, "[t]he workstation

can be modified regarding sitting v. standing ratio." Id. at HLI00268.  Certainly, there is other language in the Bloomberg questionnaire that states Plaintiff's job required seven hours of sitting, but that language must be read in context of the "sitting v.  standing ration" language.  If Bloomberg has indicated that it is willing to alter that ratio, Hartford is entitled to credit Bloomberg's representation.  Estate of Schwing v.  The Lilly Health Plan, 562 F.3d 522, 527 (3d Cir.  2009) ("There is no requirement that an ERISA administrator faced with an issue of who is to be believed must conduct an independent investigation into the veracity of each account.") (citation omitted).

Even if I were to reach a contrary result, such as crediting Plaintiff's estimation of Bloomberg's willingness to modify her workstation over that of Bloomberg, I may not substitute my reading of the record for Hartford's.  I can not reject Hartford's finding unless it is without reason and unsupported by substantial evidence.  Abnathya, 2 F.3d at 45.  Moreover, nothing else in the record suggest that Bloomberg's willingness to attempt modification a second time was inadequate or false.  Plaintiff's contention that a prior attempt at modification failed does not create a genuine issue as to Bloomberg's future willingness to modify.  Furthermore, Plaintiff offers no evidence whatsoever that Bloomberg is either unwilling or unable to adequately accommodate Plaintiff's sitting restrictions in the future; indeed, the record suggest that Plaintiff has refused to return to work since the filing of her claim, denying both Bloomberg and herself the opportunity to determine if accommodations are possible.  See AR at HLI00284.

Plaintiff also argues that the finding is arbitrary and capricious because Bloomberg submitted the Physical Demand Analysis report before Plaintiff had a chance to submit all of her medical evidence as part of the claim.  Therefore, Plaintiff asserts that

30

Bloomberg cannot possibly have known all of the limitations that must be accommodated. The Court finds this distinction irrelevant. The Physical Demand Analysis report did not purport to claim that Bloomberg can accommodate any and all of Plaintiff's limitations; it simply stated that the ratio of sitting and standing can be modified. Whatever medical information Plaintiff may have provided to Bloomberg would not change this determination. It is Defendant's burden, not Bloomberg's, to determine whether Plaintiff can perform "the necessary functions of [her] Regular Occupation which cannot be reasonably omitted or altered" under the Plan. Because Plaintiff's only limitation that needs accommodation is the limitation for prolonged sitting, it was reasonable for Defendant to rely on the Physical Demand Analysis report to conclude that Plaintiff's job can be reasonably altered to accommodate Plaintiff's impairment. Hence, the Court finds that Defendant's reliance was not arbitrary and capricious, regardless of the timing of the report. The Court, further, concludes that reliance on Bloomberg's representation provides sufficient support for Hartford's decision. Accordingly, its motion for summary judgment is granted.

## IV.   Conclusion

For the foregoing reasons, Plaintiff's Motion for Summary Judgment is DENIED and Defendant's Motion for Summary Judgment is GRANTED. In addition, Defendant's Motion to Strike is DENIED. An appropriate Order shall follow.

 /s/ Freda L. Wolfson
The Honorable Freda L. Wolfson
United States District Judge

Date: May 28, 2010